Filed 7/30/14  P. v. Wolcott CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>OLIVER E. WOLCOTT,<br><br>        Defendant and Appellant. | A136484<br><br>(San Francisco City & County<br>Super. Ct. No. 217788) |

Defendant Oliver E. Wolcott was convicted of attempted robbery and aggravated assault after he struck a woman waiting at a bus stop and grabbed her cell phone.  He contends the trial court erred in refusing to suppress statements from his police interview, permitting the introduction of those statements as rebuttal evidence, limiting the scope of testimony regarding his mental disorder, and denying him probation.  We affirm.

## BACKGROUND

Defendant was charged in an information, filed April 12, 2012, with second degree robbery (Pen. Code, § 211) and assault with force likely to cause great bodily injury (Pen. Code, § 254, subd. (a)(4)).  An enhancement allegation that defendant caused great bodily injury was later stricken by the district attorney's office.

At a bus stop, defendant sat down next to a woman who was speaking on a cell phone.  As the woman ended the call, defendant hit her and grabbed for the phone.  The victim held on, and they struggled.  When defendant rose to leave the shelter, the victim grabbed his shoulders and was dragged several feet before losing her grip and landing

1

awkwardly on the sidewalk.  The cell phone flew into the air, landing on the ground nearby, and defendant began to run.  Onlookers chased him down.

Defendant was interviewed at a police station.  The officers did not deliver the *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)) until approximately seven minutes into the interview, after preliminary questions about defendant's background, criminal history, and activities on the morning of the assault.  When told he had the right to remain silent and cautioned his statements could be used against him, defendant told the officers he understood.  This colloquy followed:

"[Officer]:  You have the right to talk to a lawyer and have him present before and during questioning.  Do you understand?

"[Defendant]:  Yeah.  But you're still, you're already questioning me, so where is my lawyer?

"[Officer]:  Ah, you have a right to one if you'd wish.

"[Defendant]:  I can't afford it.

"[Officer]:  If you can't afford it—

"[Defendant]:  Then what?

"[Officer]:  One would be present before you [sic] before and during questioning and then we would stop.  And I'd only hear one side of the story and that would be it.  Do you understand your right to have a lawyer?

"[Defendant]:  No, because I don't have a lawyer 'cause I can't afford one.

"[Officer]:  So what are you tryin' to tell me here?

"[Defendant]:  What I'm saying is I guess I'll trust you to read my Miranda rights . . . but I can't afford a lawyer anyway.

"[Officer]:  Do you want a lawyer?  Is that what you're telling me?

"[Defendant]:  No.  I'm gonna say if you guys gonna let me go—I have a court appearance tomorrow in, it's in Pittsburg though.

"[Officer]:  Oh.

"[Defendant]:  Just so you know . . . In Pittsburg I have a court appearance, so the sooner I get outta here, the quicker I show up there.

"[Officer]: Okay. But it still isn't really clear. You answer my question.

"[Defendant]: But I don't , I can't—

"[Officer]: You don't?

"[Defendant]: Afford a lawyer.

"[Officer]: Well, if you can't afford one, one can be present before and being questioned which, if you can't afford one, one will be appointed to represent you before and during questioning, if you wish one.

"[Defendant]: I don't want a lawyer. I wanna go home and eat.

"[Officer]: So do you understand that right I just read you? If you cannot afford to hire a lawyer, one will be appointed to represent you before and during questioning?

"[Defendant]: Yes but—

"[Officer]: Okay.

"[Defendant]: Yeah.

"[Officer]: Yeah. It's cool that—

"[Defendant]: It was before or during questioning 'cause you're questioning me now, so—

"[Officer]: Yeah.

"[Defendant]: If you—if I can't afford one, where is he?

"[Officer]: Right. Well, that's why I'm asking you. You want a lawyer?

"[Defendant]: No.

"[Officer]: No.

"[Defendant]: I do wanna go home and eat . . . .

[¶] . . . [¶]

"[Officer]: Okay. Let me read you your last right. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand?

[¶] . . . [¶]

"[Defendant]: Yes, I do.

"[Officer]: Do you understand each of these rights that I have explained to you?

3

"[Defendant]: Yeah.

"[Officer]: Having these rights in mind, do you wish to talk to us now?

"[Defendant]: Ah, you know, like, yeah, I know, I'm good.

"[Officer]: So that's a yes?

"[Defendant]: Yes, I'm good."

Following this colloquy, defendant discussed the day's events, acknowledging that he "tried," but failed to steal the phone and denied any assault.

Defendant moved to suppress his statements during the interview. The trial court held a hearing at which one of the officers present at the interview testified briefly. Although the court excluded a statement by defendant about his criminal history given prior to the discussion of *Miranda* rights, the court otherwise found that defendant "knew what his *Miranda* rights were and he knowingly, intelligently and voluntarily waived those rights and chose to talk to the officers." The court noted that defendant was educated and well spoken, questioned the officers about his rights, and was given straightforward answers by the officers.

At trial, defendant was allowed to present testimony by a psychiatrist who diagnosed him as suffering from a mental disorder. The prosecution had moved in limine to exclude testimony about defendant's psychiatric problems, contending the evidence was irrelevant to defendant's formation of the specific intent for the crime of robbery. The court initially deferred a ruling on the admissibility of defendant's evidence, concerned the psychiatrist's report made no direct connection between defendant's symptoms and his formation of the required intent. It ultimately permitted the testimony after submission of a revised statement from the psychiatrist that addressed this issue.

Prior to the expert's testimony, the court granted a prosecution motion under Evidence Code section 352 to limit his testimony about defendant's psychological history to five years before the alleged crime, thereby ruling inadmissible evidence about defendant's life before he developed the symptoms of his mental illness. In return, the prosecution agreed not to dispute the fact of defendant's mental disorder. As the court explained its ruling, "It appears that what the defense is trying to do is get in a lot of

4

marginally relevant information that is multiple levels of hearsay, but the sole purpose of which is to play to the sympathies of the jury, rather than having them look at this case and what the defense is."

Closer in time to the psychiatrist's testimony, the prosecution sought to exclude the testimony of three family members of defendant about his development of psychotic symptoms and the expression of those symptoms in his daily life. Defense counsel argued the testimony was relevant because the psychiatrist had relied on interviews with these witnesses in reaching his diagnosis. Examining communications from the psychiatrist, the trial court noted that the expert formed his diagnosis before he had spoken to family members and noted in an e-mail, " 'The collateral interviews [with family members] only corroborated my impressions from the interview and the medical records available indicating that [defendant] suffers from a psychotic disorder not otherwise specified.' " Given what it believed to be the "collateral" nature of the family interviews to the psychiatrist's diagnosis, the court ruled their testimony inadmissible under Evidence Code section 352 and limited the psychiatrist's testimony about the basis for his opinions to his interview with defendant and review of medical records. Although the psychiatrist was not permitted to discuss the content of the interviews, he was allowed to state that they corroborated his diagnosis.

The prosecution did not introduce evidence of the police interview in its case-in-chief. Following defendant's presentation of expert testimony regarding his ability to form the specific intent for the crime, however, the prosecution announced its intention to introduce the recording of the interview, arguing defendant's conduct and statements during the interview demonstrated he was capable of forming a specific intent to steal. The prosecutor explained that she did not present the interview in her case-in-chief because defendant's admission during the interview that he tried, but failed to steal the phone was not consistent with the prosecution's theory of a completed robbery. The court permitted introduction of the recording, subject to an instruction limiting its consideration to the issue of defendant's state of mind. As the court explained, "[t]he statements made immediately after this incident, the manner in which the defendant was

5

logically able to respond and follow that, given what [the psychiatrist] testified about, . . . this tape is a part of the evidence that this jury can consider in making that determination. [¶] The Court would also note again there was no report by [the psychiatrist]. The People have had some idea about what he would testify about in this case, but it was not until after his testimony was completed that the People were aware of the extent of the testimony."

Defendant was convicted of attempted second degree robbery and assault with force likely to cause great bodily injury. The trial court denied probation and sentenced defendant to the mitigated term of two years on the assault conviction. In explaining its decision to deny probation, the court acknowledged the role of defendant's mental illness in his crime, but it noted, "there would not be a likelihood that the defendant would succeed upon a grant of probation. More specifically, the Court notes that this offense happened within a month of defendant being granted probation from the State of Oregon. Th[at] crime also involved a degree of violence, and the defendant has had misdemeanor conduct, but it went from a DUI to harassment, to this conduct. So the Court sees the conduct actually escalating, and so for those reasons the Court is going to deny the defendant's request for probation."

## DISCUSSION

### A. *Miranda*

Defendant contends the recording of his police interview should have been suppressed because his waiver of *Miranda* rights was not knowing and voluntary and police engaged in impermissible "softening up" before informing him of his rights.

" '*Miranda v. Arizona*[*, supra,* 384 U.S. 436], and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed. [Citations.] . . .' 'To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation.' "

6

(*People v. Duff* (2014) 58 Cal.4th 527, 551.)  "The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' "  (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.)

Defendant contends his statements during the portion of the interview quoted above demonstrate confusion about his right to counsel and the consequences of his decision to proceed without counsel.[1]  In that portion, defendant appeared to have difficulty understanding why an attorney was not present.  Contrary to his contention, these comments do not suggest he was confused about his right to a lawyer.  Rather, they appeared to arise in response to the officer's statement that if defendant could not afford a lawyer, "one will be appointed to represent you before and during questioning."  Taken literally, the statement implied that an appointed attorney should already have been present, since defendant was unable to afford a lawyer and the questioning had begun several minutes earlier.  Given this right, defendant wondered why an appointed attorney was not already at the table.

We do not regard this confusion, assuming it was genuine, to represent an inability to understand "both the nature of the right being abandoned and the consequences of the decision to abandon it."  (*People v. Sauceda-Contreras, supra,* 55 Cal.4th at p. 219.)  There is no reason to doubt defendant when he told the officers that he understood he had the right to refuse to speak and to have an appointed attorney present.  Rather than demonstrating confusion about his rights, defendant's expectation that an attorney should already have been appointed for him reflects his *understanding* of these rights.  In confirming his understanding, defendant was firm in responding several times that he did

---

[1] There is no reason to question defendant's understanding of the three other warnings.  When they were given, he confirmed his understanding in a manner that gave no suggestion of confusion.

7

not want to have an attorney present.  We agree with the trial court that this waiver was knowing and intelligent.**2**

Citing *People v. Honeycutt* (1977) 20 Cal.3d 150 (*Honeycutt*), defendant also argues the officers " 'softened him up' " by waiting for approximately seven minutes before beginning the *Miranda* admonitions and making various friendly comments, such as discussing the virtues of Oregon and telling defendant his prior offenses were not particularly serious.  In *Honeycutt*, the officers, faced with an angry and recalcitrant suspect, admittedly engaged in a deliberate process of "softening [him] up" by speaking with the suspect for 30 minutes before beginning the *Miranda* warnings, discussing mutual acquaintances, insulting the victim, and generally ingratiating themselves.  (*Id.* at p. 160.)  The court found the conduct "violated . . . the spirit of *Miranda*."  (*Ibid.*)

In the nearly 40 years since *Honeycutt* was decided, it has been confined repeatedly to its facts, which involved deliberate conduct to erode the defendant's will through ingratiating conversation and disparagement of the victim.  (See *People v. Scott* (2011) 52 Cal.4th 452, 477–478 (*Scott*); *People v. Michaels* (2002) 28 Cal.4th 486, 511 (*Michaels*); *People v. Gurule* (2002) 28 Cal.4th 557, 602 (*Gurule*); *People v. Kelly* (1990) 51 Cal.3d 931, 954 (*Kelly*).)  In particular, it has been held that *Honeycutt* does not announce a general ban on small talk between police and a suspect.  (See *Gurule,* at p. 602.)  Further, there is no requirement that police give the *Miranda* warnings at the very beginning of an interview; rather, they must be given before any question that could reasonably be construed as calling for an incriminating response.  (*People v. Gamache* (2010) 48 Cal.4th 347, 388.)  The empathetic comments cited by defendant are not the type of "egregious misconduct" (*Kelly,* at p. 954) necessary to invalidate a defendant's waiver.  (See *Scott,* at p. 477 [discussion of school, roommates and hobbies acceptable]; *Michaels,* at p. 511 [comment "two sides to every story" acceptable].)  There is no reason

---

**2** Defendant also contends he was "lulled into believing" he would be let go after the admonition.  While defendant did express the expectation he would be released at some point, there is no indication the police created this expectation or that defendant's decision to speak without counsel was in some way based on this expectation.

to believe the officers' friendly manner lulled defendant into an involuntary waiver of his rights, nor is there any reason to believe their conduct was intended to do so.

## B. Limitations On Mental Health Testimony

Defendant contends the trial court erred and denied him due process of law when it excluded under Evidence Code section 352 expert and lay testimony of specific examples of the manner in which his mental disorder has affected his conduct and thought processes.

A defendant is "free to offer evidence that he suffered from a mental disease or defect as well as evidence about that disease or defect" in order to demonstrate that he did not form the intent necessary for a particular crime. (*People v. Coddington* (2000) 23 Cal.4th 529, 583, disapproved on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) "Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*Id.* at p. 582, fns. omitted.)

"Evidence Code section 352 provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' . . . '[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" ' " (*People v. Williams* (2013) 58 Cal.4th 197, 270–271 (*Williams*).)

Defendant contends the excluded evidence would have provided a "historical understanding of the impact of [his] disorder on his thoughts and actions" and would

9

have informed the jury how his mental disorder "had affected his intent to act in other situations." In evaluating this argument in the context of a section 352 analysis, it is important to recognize that the psychiatrist was permitted to testify, without dispute from the prosecution, that defendant suffered from a mental disorder and to describe the manner in which such a disorder generally affects a person's thought processes and behavior. A description of the history of defendant's disorder was only tangentially relevant to the matter at issue, which was the *present* impact of the disorder on his ability to form the requisite intent—the topic about which the expert was permitted to testify. It is conceivable that evidence of defendant's conduct in another situation might have been relevant, if the circumstances were sufficiently similar, but defendant made no offer of proof of a closely parallel circumstance. Accounts of the general manner in which the disorder affected defendant's conduct would have demonstrated only that he conformed to the general description of the disorder provided by the psychiatrist. In other words, they would have confirmed a diagnosis that the prosecution did not dispute. Given the marginal relevance of such evidence in light of the expert's testimony, the trial court did not abuse its discretion in concluding that its probative value did not outweigh the time required for its presentation and the risk of undue prejudice. We cannot say the trial court's ruling was " ' "arbitrary, capricious or patently absurd [or] resulted in a manifest miscarriage of justice." ' " (*Williams, supra,* 58 Cal.4th at pp. 270–271.)

Defendant relies most heavily on this court's decision in *People v. Larsen* (2012) 205 Cal.App.4th 810 (*Larsen*), in which we found the trial court's failure to give a jury instruction addressing a mental disorder to be harmless error. (*Id.* at p. 834.) That instruction, CALCRIM No. 3428, was provided at defendant's trial. Beyond recognizing the importance of expert testimony in these circumstances, *Larsen* does not otherwise address the particular issue presented here.[3]

---

[3] Defendant also takes issue with the trial court's purported ruling that defendant had not provided a sufficient proffer to demonstrate the relevance of the evidence. Because we find the evidence properly excludable under section 352, we do not address

## C. Rebuttal Evidence

Defendant contends it was improper for the prosecution to introduce evidence of his police interview for the first time in its rebuttal case.

"[I]t is improper for a prosecutor to withhold 'crucial evidence properly belonging in the case-in-chief' [citations], and to present it in rebuttal to take unfair advantage of a defendant." (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 30.)  " '[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime.  It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.'  Restrictions are imposed on rebuttal evidence (1) to ensure the presentation of evidence is orderly and avoids confusion of the jury; (2) to prevent the prosecution from unduly emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) to avoid 'unfair surprise' to the defendant from confrontation with crucial evidence late in the trial." (*People v. Young* (2005) 34 Cal.4th 1149, 1199 (*Young*).)  "Rebuttal evidence . . . ' "must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." '  [Citation].  'The admission of evidence in rebuttal is a matter left to the sound discretion of the trial court.  [Citation.]  The court's decision in this regard will not be disturbed on appeal in the absence of "palpable abuse." ' "  (*People v. Brown* (2003) 31 Cal.4th 518, 579.)

While it is true the inculpatory statements could have been introduced in the prosecution's case-in-chief, the admissions cannot be considered "crucial evidence" in light of the various eyewitness accounts available.  Further, as the prosecutor explained, the admissions were not entirely consistent with the prosecution's theory.  Yet the manner in which defendant conducted himself during the interview and his acknowledgement of an intent to steal responded directly to the primary issue raised in defendant's case, his ability to form such an intent.  The trial court could, therefore,

---

this issue.  Defendant's due process claim fails with his state law claim.  (*People v. Vangelder* (2013) 58 Cal.4th 1, 38, fn. 31.)

reasonably conclude the evidence was proper rebuttal evidence, since it addressed a specific issue raised in the defense presentation, rather than the more general issue of defendant's guilt. (See *Young, supra,* 34 Cal.4th at p. 1199 ["Testimony that repeats or fortifies a part of the prosecution's case that has been impeached by defense evidence may properly be admitted in rebuttal"]; *People v. Mayfield* (1997) 14 Cal.4th 668, 761–762 [evidence partially inconsistent with the prosecution case can be introduced in rebuttal if it directly addresses facts impeached in the defense case].) We find no palpable abuse of discretion in the trial court's decision.[4]

## D. Denial of Probation

Defendant contends the trial court erred in denying him probation because the court failed properly to consider the alternative of an "individualized mental health treatment program."

"A trial court has broad discretion to determine whether a defendant is suitable for probation. [Citation.] [A]n appellant bears a heavy burden when attempting to show an abuse of such discretion. [Citation.] To establish abuse, the defendant must show that, under all the circumstances, the denial of probation was arbitrary, capricious or exceeded the bounds of reason." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 89.) In deciding whether to grant probation, the trial court should consider the various factors enumerated in California Rules of Court, rule 4.414, although it can consider other factors as well. (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1312–1313.)

In denying probation, the trial court recognized the impact of defendant's mental illness on his conduct, but it concluded he was unlikely to succeed on probation, had committed the offense while on probation elsewhere, and was developing a pattern of criminal activity. These are appropriate factors under California Rules of Court, rule 4.414. (Rule 4.414(b)(1), (2), (4).) Defendant does not even attempt to demonstrate that the denial of probation was "arbitrary" or "exceeded the bounds of reason," which it plainly was not. Defendant merely argues the trial court should have exercised its

---

[4] We need not address defendant's claim of prejudicial cumulative error, since defendant has failed to demonstrate error.

discretion in a different manner.  Our standard of review does not permit the second-guessing of a reasoned decision arrived at upon a consideration of relevant factors.

## DISPOSITION

The judgment of the trial court is affirmed.


_____
Becton, J.*


We concur:


_____
Margulies, Acting P.J.

_____
Banke, J.


* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.